1
2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEVADA

3
4
5
6

EBONI D. LUCAS, JEREMY
GOARD, CHRISTOPHER
MANLONGAT and SHAWNDREA
STAFFORD, individually and on
behalf of all others similarly situated,

)
)
)
)
)
)

Case No.: 2:20-cv-01750

7

Plaintiffs,

)
)

**CLASS ACTION COMPLAINT**

8
9
10
11
12
13
14
15
16

v.

MGM RESORTS
INTERNATIONAL, THE BOARD
OF DIRECTORS OF MGM
RESORTS INTERNATIONAL, THE
ADMINSTRATIVE COMMITTEE
OF MGM RESORTS
INTERNATIONAL, and JOHN
DOES 1-30.

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

```
——— FILED          ——— RECEIVED
——— ENTERED        ——— SERVED ON
          COUNSEL/PARTIES OF RECORD

          SEP 2 3 2020

     CLERK US DISTRICT COURT
        DISTRICT OF NEVADA
 BY:_____ DEPUTY
```

17
18

# COMPLAINT

19

Plaintiffs Eboni D. Lucas, Jeremy Goard, Christopher Manlongat and

20
21
22

Shawndrea Stafford ("Plaintiffs"), by and through their attorneys, on behalf of the

MGM Resorts 401(k) Savings Plan (the "Plan"),[1] themselves and all others similarly

23

situated, state and allege as follows:

24

## I.    INTRODUCTION

25
26
27
28

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include MGM Resorts International ("MGM" or "Company"), the Board of Directors of MGM International during the Class Period ("Board")[2] and the Administrative Committee of MGM Resorts International and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.    To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. Dec. 30, 2016) (*en banc*).

3.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

---

[2] The Class Period is defined as September 22, 2014 through the date of judgment.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4.     "The Restatement ... instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

5.     As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees ... lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

6.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Even though 401(k) accounts are fully funded at all times, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

CLASS ACTION COMPLAINT

7.     The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See, "A Look at 401(k) Plan Fees," supra,* at n.3; *see also Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

8.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses* (July 2016), at 4. "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.,* at 5.

9.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

10.     At all times during the Class Period (September 22, 2014 through the date of judgment) the Plan had more than $1.1 billion dollars in assets under management.  At the end of 2017 and 2018, the Plan had over $1.4 billion dollars and

$1.6 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.  The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.   Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

12.   In many instances, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan despite their lower fees and materially similar investment objectives.

13.   Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty,

in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II. JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

16. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.   PARTIES

#### Plaintiffs

18.     Plaintiff, Eboni D. Lucas ("Lucas"), resides in Troy, Michigan.  During her employment, Plaintiff Lucas participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

19.     Plaintiff, Jeremy Goard ("Goard"), resides in Saratoga, New York. During his employment, Plaintiff Goard participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Plaintiff, Christopher Manlongat ("Manlongat"), resides in Las Vegas, Nevada.   During his employment, Plaintiff Manlongat participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

21.     Plaintiff, Shawndrea Stafford ("Stafford"), resides in Las Vegas, Nevada.  During her employment, Plaintiff Stafford participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

22.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.   Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

CLASS ACTION COMPLAINT

23.    Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

24.    A few months prior to filing this lawsuit, Plaintiffs requested pursuant to ERISA §104(b)(4) that the Plan administrator produce several Plan governing documents, including any meeting minutes of the relevant Plan investment committee(s), which potentially contain the specifics of Defendants' *actual* practice in making decisions with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments. Plaintiffs' request for meeting minutes was denied.

25.    Accordingly, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-mart Stores, Inc.,* 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading

facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

26.     Having never managed a jumbo 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.   For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**Defendants**

**Company Defendant**

27.     MGM is the Plan sponsor and a named fiduciary with a principal place of business being 840 Grier Drive, Las Vegas, Nevada.   2018 Form 5500 filed with the Dept. of Labor ("2018 Form 5500") at 1.

28.     MGM was incorporated in 1986 as a Delaware corporation. *See,* the December 31, 2019 10-k Filing of MGM Resorts International with the United States Securities and Exchange Commission ("2019 10-k") at 1. MGM describes its corporate activity as largely "a holding company and, through subsidiaries, owns and operates integrated casino, hotel, and entertainment resorts across the United States and in Macau." *Id.* At the end of 2019, MGM reported $12.9 billion dollars in net revenue. 2019 10-k at ii. At December 31, 2019, MGM reported that it had

"approximately 52,000 full-time and 18,000 part-time employees domestically ... ."
2019 10-k at 8.

29.     MGM has delegated its responsibilities for the management and prudent oversight of the Plan to the Administrative Committee of MGM Resorts International ("Committee"). As detailed in the Plan document "[c]ommittee shall mean the Administrative Committee appointed by the Company which administers the Plan pursuant to Article XI." The MGM Resorts 401(k) Savings Plan, as Restated and Amended Effective January 1, 2018 ("Plan Doc.") at 1.13.

30.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

31.     MGM also makes discretionary decisions to make company matching contributions to Plan participants. Plan Doc. at III-4. Pursuant to the Plan Doc. "each Employer may make Matching Contribution to the Plan on behalf of each Participant who has completed a Year of Contribution Service ... ." *Id.*  Throughout the Class Period, MGM did, in fact, elect to make matching contributions to the Plan. The December 31, 2014 through December 31, 2018 Reports of Independent Auditor for the MGM Resorts 401(k) Savings Plan ("2014 through 2018 Auditor Reports") at 5.

32.     Lastly, MGM acted through its officers to perform Plan-related fiduciary functions in the course and scope of their employment.

33.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

CLASS ACTION COMPLAINT

**Board Defendants**

34.     As noted above, MGM, acting through its Board of Directors, has delegated its responsibilities for the management and prudent oversight of the Plan to the Committee. As detailed in the Plan document "'[c]ommittee shall mean the Administrative Committee appointed by the Company which administers the Plan pursuant to Article XI." Plan Doc. at 1.13.

35.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

36.     MGM, acting through its Board, also makes discretionary decisions to make company matching contributions to Plan participants. Plan Doc. at III-4. Pursuant to the Plan Doc. "each Employer may make Matching Contribution to the Plan on behalf of each Participant who has completed a Year of Contribution Service … ." *Id.*  Throughout the Class Period, MGM, acting through its Board, did, in fact, elect to make matching contributions to the Plan. 2014 through 2018 Auditor Reports at 5.

37.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

CLASS ACTION COMPLAINT

38.    The unnamed members of the Board of Directors for MGM during the Class Period are collectively referred to herein as the "Board Defendants."

### Committee Defendants

39.    In theory, the Committee is responsible for prudently selecting and monitoring the performance of the funds available for selection by plan participants. However, in practice, the Committee failed to prudently carry out these fiduciary duties. As detailed above, MGM, acting through its Board, appointed the Committee. Pursuant to the Plan Doc., the Committee is the Plan Administrator as that term is defined. Plan Doc at 1.58. As described in the Plan Doc.: "Plan Administrator shall mean the Committee." *Id.* As further described in the Plan Doc.: "[t]he Fund shall be composed of Investment Funds designated by the Committee." Plan Doc. at XII-1. Pursuant to the Trust Agreement, the Committee has the responsibility to "direct the Trustee as to the investment options in which participants may invest the assets in their individual accounts ... ." Trust Agreement between MGM Resorts 401(k) Savings Plan and Prudential Bank & Trust, FSB dated June 26, 2012 ("Trust Agreement") at 6. The 2018 Auditor Report describe the Committees function as being "responsible for the Plan's investment options and the monitoring of investment performance." 2018 Auditor Report at 5.

40.    The Trust Agreement defines the Committee as a fiduciary. As described in the Trust Agreement "the Plan's Administrative Committee (the "Administrator") has the authority to control and manage the operation and administration of the Plan

in accordance with the terms of the Plan, and also serves as the named fiduciary under the Plan."

41.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

42.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

43.    To the extent that there are additional officers, employees and/are contractors of MGM who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, MGM officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.   THE PLAN

44.     The Plan was originally established on January 1, 1993 as the "MGM Grand Hotel, Inc. Employees 401(k) Savings Plan and Trust … ." Plan Doc. at i. The Plan underwent several amendments since then. Most notably, the Plan changed its name to its current name the MGM Resorts 401(k) Savings Plan on June 15, 2010. *Id.* It's most recent restatement and amendment was effective on January 1, 2018. *Id.*

45.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.   Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.   2018 Auditor Report at 5.

### *Eligibility*

*46.*     In general, regular full-time employees who've completed at least 500 hours of service are eligible to participate in the Plan.   The Summary Plan Description of the MGM Resorts 401(k) Savings Plan ("SPD") at 4.

### *Contributions*

47.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an

CLASS ACTION COMPLAINT

employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. 2018 Auditor Report at 5 and 6.

48.     With regard to employee contributions, "Participants may contribute up to 75% of their eligible annual salary to the Plan subject to certain nondiscrimination restrictions and an annual limitation of $18,500 for 2018 ($24,500 for those participants who are age 50 or over)." 2018 Auditor Report at 5.  With regard to matching contributions made by MGM, MGM, at its discretion, will match "50% of deferral contributions up to 6% of eligible compensation but not to exceed $1,500" *Id.*

49.     Like other companies that sponsor 401(k) plans for their employees, MGM enjoys both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https:/www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

50.     MGM also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract    new    employees    and    reduce    turnover."    *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

51.    Given the size of the Plan, MGM likely enjoyed a significant tax and cost savings from offering a match.

***Vesting***

52.    With regard to contributions to the Plan made by employees, "[p]articipants are immediately vested in their contributions, rollovers and related earnings thereon at all times." 2018 Auditor Report at 6. With regard to matching contributions made by MGM: "[a]ll participants … vest in employer matching contributions at the rate of 20% after one year of service and are 100% vested after five years of credited service. *Id.*

***The Plan's Investments***

53.    As detailed above, the Committee purportedly prudently monitors and evaluates the performance of the investments made available to participants. But in practice, as alleged below, the Committee breached its fiduciary duties.

54.    Several funds were available to Plan participants for investment each year during the putative Class Period.

55.    The Plan's assets under management for all funds as of December 31, 2018 was over $1.6 billion dollars.  2018 Auditor Report at 3.

***Payment of Plan Expenses***

56.    During the Class Period Plan assets were used to pay for expenses incurred by the Plan, including recordkeeping fees. As detailed in the 2018 Auditor Report: "[a]dministrative expenses of the Plan are paid by the Plan, including

beginning in 2018, a quarterly fixed percentage administrative fee amount paid by participants." 2018 Auditor Report at 7.

## V. CLASS ACTION ALLEGATIONS

57.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate
> family members, who were participants in or beneficiaries
> of the Plan, at any time between September 22, 2014
> through the date of judgment (the "Class Period").

58.     The members of the Class are so numerous that joinder of all members is impractical.   The 2018 Form 5500 filed with the Dept. of Labor lists 31,053 Plan "participants with account balances as of the end of the plan year."   2018 Form 5500 at 2.

59.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.   Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

CLASS ACTION COMPLAINT

entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

60.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

      A.    Whether Defendants are fiduciaries of the Plan;

      B.    Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

      C.    Whether the Company and the Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

      D.    The proper form of equitable and injunctive relief; and

      E.    The proper measure of monetary relief.

61.    Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

62.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of

- 18 -

separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

63.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

64.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

65.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or

disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

66.    As described in the Parties section above, Defendants were fiduciaries of the Plan because:

(a)    they were so named; and/or

(b)    they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)    they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)    they had discretionary authority or discretionary responsibility in the administration of the Plan.

67.    As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  These twin duties are

referred to as the duties of loyalty and prudence and are "the highest known to the law." *Tibble*, 843 at 1197 (9th Cir. Dec. 30, 2016)(en banc).

68.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.     *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted).   Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." *Dep't of Labor ERISA Adv. Op. 88-16A*, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

69.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons.

70.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).   In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to

CLASS ACTION COMPLAINT

monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

71.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

72.     During the Class Period, Defendants did not act in the best interests of the Plan participants.  Investment fund options chosen for a plan should not favor the fund provider over the plan's participants.  Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

73.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate

and reasonable fees for the Plan's investment options. Additionally, Defendants failed to leverage the size of the Plan to negotiate for (1) lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period; and (2) a prudent payment arrangement with regard to the Plan's recordkeeping and administrative fees.

74.    As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII.   SPECIFIC ALLEGATIONS

**A.    Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

75.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several investments in the Plan throughout the Class Period, including those identified below, that wasted the Plan and participants' assets because of unnecessary costs.

76.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts, ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts, § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular

performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident" or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

77.    Investment options have a fee for investment management and other services.  With regards to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For  example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return. This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

78.    When jumbo plans, particularly those with over $1 billion dollars in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

79.    One indication of Defendants' failure to prudently monitor the Plan's funds is that the Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared

CLASS ACTION COMPLAINT

with comparable or superior alternatives, and despite ample evidence available to a

reasonable fiduciary that these funds had become imprudent due to their higher costs

relative to the same or similar investments available. This fiduciary failure decreased

participant compounding returns and reduced the available amount participants will

have at retirement.

80. Another indication of Defendants' failure to prudently monitor the

Plan's funds is that several funds during the Class Period – which stayed relatively

unchanged during the Class Period - were more expensive than comparable funds

found in similarly sized plans (plans having between $500 million dollars and $1

billion dollars in assets).

81. In 2018, for example, many of the mutual funds in the Plan had in some

cases a *107%* difference (in the case of Eaton Vance Atl Cap SMID A) and up to a

*99%* difference (in the case of MFS Mid Cap Val R3) from the median expense ratios

in the same category. The chart below illustrates these differences for each applicable

fund in the Plan:[5]

| Plan Fund | Expense Ratio[6] | Category | ICI Median Fee |
|---|---|---|---|
| MFS Mid Cap Val R3 | 1.06% | Domestic Equity | 0.36% |
| Eaton Vance Atl Cap SMID A | 1.19% | Domestic Equity | 0.36% |

[5] *See* BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019) (hereafter "ICI Study") available at: https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

[6] The listed expense figures are as of 2019.

CLASS ACTION COMPLAINT

| Plan Fund | Expense Ratio[6] | Category | ICI Median Fee |
|---|---|---|---|
| MFS Mass Inv Gro Stk R3 | 0.71% | Domestic Equity | 0.36% |
| JPM Equity Income R5 | 0.56% | Domestic Equity | 0.36% |
| TRowe Growth Stock Strategy Ins SMA | 0.47% | Domestic Equity | 0.36% |
| Invesco Small Cap Gro Insurance SMA | 0.72% | Domestic Equity | 0.36% |
| Victory Syc Small Cap Value SMA | 0.75% | Domestic Equity | 0.36% |
| Lazard Int'l Equity Open Shares | 1.06% | International | 0.50% |
| American EuroPac R5 | 0.53% | International | 0.50% |
| MFS Corp Bond  R3 | 0.77% | Domestic Bonds | 0.28% |

82.    The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the above ICI Median fee is based on a study conducted in 2016 when expense ratios were generally higher than fees today or even in 2019 given the downward trend of expense ratios the last few years. Accordingly, 2019 median expense ratios would be lower than indicated above, demonstrating a greater disparity between the 2019 expense ratios utilized in the above chart for the Plan's funds and the median expense ratios in the same category.

83.    Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan's funds because many prudent alternative funds were available that offered lower expenses than the median.

**Failure to Utilize Lower Fee Share Classes**

84.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares

CLASS ACTION COMPLAINT

are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

85.    Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

86.    Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

87.   As demonstrated by the chart below, Defendants' failure to select lowest cost share class was an indication of their failure to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds. The chart below uses 2019 expense ratios to demonstrate how much more expensive the funds were than their identical counterparts:

| Current Fund | ER | Lower Share Class | ER | Category | % Fee Excess |
|---|---|---|---|---|---|
| MFS Mid Cap Val R3 | 1.06% | MFS Mid Cap R6 | 0.67% | Mid Value | 58% |
| Eaton Vance Atl Cap SMID A | 1.19% | Eaton Vance Atl Cap SMID I | 0.91% | Mid Cap Growth | 31% |
| MFS Mass Inv Gro Stk R3 | 0.71% | MFS Mass Inv Gro Stk R4 | 0.46% | Large Growth | 54% |
| JPM Equity Income R5 | 0.56% | JPM Equity Income R6 | 0.46% | Large Value | 22% |
| Lazard Int'l Equity Open Shares | 1.06% | Lazard Int'l Equity Inst. Shares | 0.80% | Foreign Large Blend | 32% |
| American EuroPac R5 | 0.53% | American EuroPac R6 | 0.48% | Foreign Large Growth | 10% |

88.   The above is for illustrative purposes only.  During the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

89.   As noted above, minimum initial investment amounts are typically waived for institutional investors like retirement plans.  *See, e.g., Davis, et al. v. Washington Univ., et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-

savings plans"); *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24).   The following is a sampling of the assets under management as of the end of 2018:

| Current Fund | 2018 Assets Under Management |
| --- | --- |
| MFS Mid Cap Val R3 | $38,878,279 |
| Eaton Vance Atl Cap SMID A | $62,201,546 |
| MFS Mass Inv Gro Stk R3 | $127,557,002 |
| JPM Equity Income R5 | $120,332,654 |
| Lazard Int'l Equity Open Shares | $121,276,310 |
| American EuroPac R5 | $74,986,360 |

90.    All of the lower share alternatives were available during the Class Period.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.

91.    There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.  Indeed, given that the lower-priced share classes were the same fund as the higher-priced classes, they had greater returns.  Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to

1   obtain better pricing or they were asleep at the wheel and were not paying attention.

2   Either reason is inexcusable.

3

4   92.   It's not prudent to select higher cost versions of the same fund even if a

5   fiduciary believes fees charged to plan participants by the "retail" class investment

6   were the same as the fees charged by the "institutional" class investment, net of the

7

8   revenue sharing paid by the funds to defray the Plan's recordkeeping costs. *Tibble, et*

9   *al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 8 (C.D. Cal. Aug. 16,

10  2017) ("*Tibble III*").   Fiduciaries should not "choose otherwise imprudent

11

12  investments specifically to take advantage of revenue sharing." *Id.* at * 11.  This lack

13  of basic fiduciary practice resonates loudly in this case especially where the

14

15  recordkeeping and administrative costs were unreasonably high as discussed below.

16  A fiduciary's task is to negotiate and/or obtain reasonable fees for investment options

17  and recordkeeping/administration fees independent of each other if necessary.

18

19  93.   Nor is it an excuse to select higher cost versions of the same fund to pay

20  for Plan expenses.   As noted above, fiduciaries should not "choose otherwise

21  imprudent investments specifically to take advantage of revenue sharing." *Tibble III*,

22  2017 WL 3523737, at * 11.

23

24  94.   The term "recordkeeping" is a catchall term for the suite of

25  administrative services typically provided to a defined contribution plan by the plan's

26  "recordkeeper." Recordkeeping expenses can either be paid directly from plan assets,

27

28  or indirectly by the plan's investments in a practice known as revenue sharing (or a

CLASS ACTION COMPLAINT

combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

95.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants. "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020). In this matter, using revenue sharing to pay for recordkeeping resulted in a worst-case scenario for Plan participants because they were saddled with outrageously high recordkeeping fees.

96.     MGM's retirement plan is a jumbo plan and has scale which affords the Plan fiduciaries the opportunity to negotiate for lower recordkeeping costs and get access to the same investments with lower expense ratios which benefit the plan participants because the returns are higher and compounding greater.

97.     Further, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the

recordkeeping rates that are available.    This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.    More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

98.    Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years."    These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[7]

99.    Defendants have wholly failed to prudently manage and control the Plan's recordkeeping and administrative costs by failing to, among other things, send out RFPs to try to obtain lower recordkeeping costs than Prudential was charging. Prudential has been the Plan's recordkeeper throughout the Class Period.

---

[7]    "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

100.   Recordkeeping and administrative fees are evaluated on a per participant cost basis. Looking at the recordkeeping and administrative fees here the Plan clearly paid an excessive amount per participant. The chart below looks at the total amount for recordkeeping and administrative fees paid by the Plan for each year of the Class Period as follows:

|  | Total Admin Costs Reported[8] | Participants | Per Participant Cost |
|---|---|---|---|
| 2014 | $1,917,967 | 26,298 | $72.93 |
| 2015 | $ 1,941,684 | 25,793 | $74.35 |
| 2016 | $2,046,125 | 25,625 | $79.84 |
| 2017 | $2,037,379 | 26,777 | $76.08 |
| 2018 | $2,161,354 | 31,053 | $69.60 |

101.   Defendants have wholly failed to prudently manage and control the Plan's recordkeeping and administrative costs by failing to try to obtain lower recordkeeping costs than Prudential was charging.

102.   By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.  One data source, the *401k Averages Book* (20th ed. 2020)[9] studies Plan fees for smaller plans, those under $200 million in

---

[8]   The method MGM used to report administrative expenses varies widely from year to year on the 2014 through 2018 Form 5500s.  However, by adding what's reported on each 5500 as "other expense" with "direct payments" to Prudential an accurate picture of the total amount  of administrative expense during the Class Period appears.  This amount may be understated because there were other administrative expenses reported but they were inconsistently reported.

[9]   "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information." *401k Averages Book* at p. 2.

CLASS ACTION COMPLAINT

assets.  Although it studies smaller plans than the Plan, it is nonetheless a useful resource because we can extrapolate from the data what a bigger plan like the Plan should be paying for recordkeeping.  That is because recordkeeping and administrative fees should *decrease* as a Plan increases in size.  For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant.  *401k Averages Book* at p. 95.  A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant.  *Id.*, at p. 108.  Thus, the Plan, with over $1.6 billion dollars in assets and over 31,000  participants, should have had direct recordkeeping costs below the $5 average, which it clearly did not.

103.  The  Plan's  total  recordkeeping  costs  (both  direct  and  indirect compensation) are clearly unreasonable as some authorities have recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.[10]

---

[10]   Case law is in accord that large plans can bargain for low recordkeeping fees.  *See, e.g., Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

CLASS ACTION COMPLAINT

104.   It's no excuse that some revenue sharing may have been credited back to participant accounts to help defray the excessive amount of recordkeeping and administrative fees charged by Prudential. The better and more prudent practice would have been to select funds in the Plan that didn't pay revenue sharing and then to negotiate a reasonable fee for recordkeeping. This would have allowed more money to remain in each participants retirement account to their benefit. Instead, the Defendants allowed Prudential to favor its own interests over plan participants.

105.   The manner in which recordkeeping costs were paid for by the Plan's fiduciaries was clearly imprudent and disloyal to the Plan participants.  The excess amount of money taken from revenue sharing that was never used to pay for recordkeeping and administrative costs cannot justify Defendants' selection of high-priced investment options to take advantage of revenue sharing.  Again, a more prudent arrangement in this case would have been to select available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration costs with no strings attached.

106.   Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

107.   A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars per year and constituted separate and independent breaches of the duties of loyalty and prudence.

108.   By failing to investigate the use of lower cost share classes and by failing to investigate lower cost recordkeeping and administrative alternatives, Defendants caused the Plan and its participants to pay millions of dollars per year in unnecessary fees.

### *Failure to Utilize Lower Cost Active or Passively-Managed Funds*

109.   As noted *supra*, ERISA is derived from trust law. *Tibble I*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts, § 100 cmt. b(1).

110.   While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term. *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively-managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see*

*also Index funds trounce actively managed funds: Study*, available at

http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-

study.html ("long-term data suggests that actively-managed funds "lagged their

passive counterparts across nearly all asset classes, especially over the 10-year period

from 2004 to 2014.")

111.   Indeed, on average, funds with high fees perform worse than less

expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When*

*Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J.

Econ. Behav. & Org. 871, 873 (2009) (hereinafter *"When Cheaper is Better"*); *see*

*also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa.

L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the

most consistent predictor of a fund's return to investors is the fund's expense ratio").

112.   During the Class Period, Defendants failed to consider materially similar

but cheaper alternatives to the Plan's investment options.   This failure is a further

indication that Defendants lacked a prudent investment monitoring process.

113.   The chart below demonstrates that the expense ratios of the Plan's

investment options were more expensive by multiples of comparable active or

passively-managed alternative funds in the same fund category.   The chart below

analyzes funds in the Plan in 2018 using 2019 expense ratios as a methodology to

demonstrate the greater relative expense of the Plan's funds compared to their

alternative fund counterparts.

| Fund in the Plan | ER | Passive/Active Lower Cost Alternative | ER | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| MFS Mid Cap Val R3 | 1.06% | MFS Mid Cap R6 | 0.67% | Mid Value | 58% |
| Eaton Vance Atl Cap SMID A | 1.19% | Vanguard Mid Cap Growth Index Adm | 0.07% | Mid Cap Growth | 1,600% |
| | | Franklin Small-Mid Cap Growth R6 | 0.50% | | 138% |
| MFS Mass Inv Gro Stk R3 | 0.71% | Fidelity Large Cap Growth Index | 0.04% | Large Growth | 1,675% |
| | | Mass Investors Growth R6 | 0.38% | | 87% |
| TRowe Growth Stock Strategy Ins SMA | 0.47% | Vanguard Russell 1000 Growth Index I | 0.07% | Large Growth | 571% |
| Lazard Int'l Equity Open Shares | 1.06% | Vanguard Total International Stock Ind Adm | 0.11% | Foreign Large Blend | 864% |
| | | Lazard Int'l Equity R6 | 0.80% | | 32% |
| American EuroPac R5 | 0.53% | Vanguard Int'l Growth ADM | 0.32% | Foreign Large Growth | 66% |

114.   The above alternative funds generally outperformed the Plan's funds in their 3 and 5 year average returns as of 2020 given that they were comprised of virtually identical underlying funds but had lower fees.  Moreover, these alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's

1  funds holdings such that any difference was immaterial.

2  115.   These results are not surprising given that in the long-term, actively
3
4  managed funds do not outperform their passively managed counterparts.  Indeed, the
5  majority of U.S. equity funds did not outperform their index counterparts in the five
6  years ending June 30, 2019:[11]
7

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark  5 Yr (%) |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 |
| Mid-Cap | S&P MidCap 400 | 63.56 |
| Small-Cap | S&P SmallCap 600 | 75.09 |
| Multi-Cap | S&P Composite 1500 | 82.79 |
| Domestic Equity | S&P Composite 1500 | 81.66 |
| Large-Cap Value | S&P Value | 84.74 |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 |
| Small-Cap Value | S&P SmallCap 600 Value | 90.57 |
| Multi-Cap Value | S&P Composite 1500 Value | 91.35 |

116.   A prudent investigation would have revealed the existence of these
lower-cost and better performing alternatives to the Plan's funds.

117.   The above is for illustrative purposes only as the significant fee
disparities detailed above existed for all years of the Class Period.  The Plan expense

[11] Source: https://us.spindices.com/spiva/#/reports

ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

### FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against the Committee Defendants)

118. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

119. At all relevant times, the Committee Defendants ("Loyalty/Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

120. As fiduciaries of the Plan, the Loyalty/Prudence Defendants were subject to the fiduciary duties imposed by ERISA Section 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

121. The Loyalty/Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each

investment and what was in the best interest of Plan participants. Instead, the Loyalty/Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Loyalty/Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. In addition, the Loyalty/Prudence Defendants failed to investigate certain collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost. Likewise, the Loyalty/Prudence Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

122. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had the Loyalty/Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

123. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty/Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for the Loyalty/Prudence Defendants' breaches as set forth in their Prayer for Relief.

124. The Loyalty/Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other

Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Loyalty/Prudence Defendant is also liable for the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against MGM and the Board Defendants)

125.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

126.   MGM and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

127.   In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

128.   The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the

information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

129.   The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses, imprudent choices of funds' class of shares, and inefficient fund management styles that adversely affected the investment performance of the Funds' and their participants' assets as a result of the Committee Defendants' imprudent actions and omissions;

(b)   Failing to monitor the processes by which Plan investments were evaluated, failing to correct the Committee Defendants' failure and continued failure to investigate the availability of lower-cost share classes and failing to correct the Committee Defendants' failure and continued failure to investigate the availability of lower-cost collective trust vehicles; and

(c)   Failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

130.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

131.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.   A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.   An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including restoring to the Plan all losses resulting from imprudent investment of the Plan's

assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

- 45 -

CLASS ACTION COMPLAINT

1    L.      Such other and further relief as the Court deems equitable and just.

2

3    Dated:      September 22, 2020        **LAW OFFICE OF HAYES & WELSH**

4
                                          */s/ Martin L. Welsh*
5                                         Martin L. Welsh, Esquire
                                          Nevada Attorney I.D. #8720
6                                         199 North Arroyo Grand Blvd.
                                          Suite 200
7                                         Henderson, Nevada  89074
                                          mwelsh@lvlaw.com
8                                         (702) 434-3444
9                                         Fax: (702) 434-3739
10

11                                        */s/ Donald R. Reavey*
                                          **CAPOZZI ADLER, P.C.**
12                                        Donald R. Reavey, Esquire
                                          *(Admission Pro Hac Vice to be Requested)*
13                                        PA Attorney ID #82498
14                                        2933 North Front Street
                                          Harrisburg, PA 17110
15                                        donr@capozziadler.com
                                          (717) 233-4101
16                                        Fax: (717) 233-4103
17

18                                        */s/ Mark K. Gyandoh*
19                                        Mark K. Gyandoh, Esquire
                                          N.J. Bar ID: 025622001
20                                        **CAPOZZI ADLER, P.C.**
21                                        312 Old Lancaster Road
                                          Merion Station, PA 19066
22                                        markg@capozziadler.com
23                                        (610) 890-0200
                                          Fax: (717) 233-4103
24

25                                        *Counsel for Plaintiffs and the Putative Class*

26

27

28

                                    - 46 -
                            CLASS ACTION COMPLAINT