# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Eboni D. Lucas, individually and on behalf of all others similarly situated,

      Plaintiff

v.

MGM Resorts International, et al.,

      Defendants

Case No.: 2:20-cv-01750-JAD-NJK

**Order Granting Summary Judgment for Defendants on Share-class Claims and Granting Defendants' Motion to Exclude Unreliable Expert Opinions of Cynthia Jones**

[ECF Nos. 149, 149-1, 150, 150-1, 166, 168]

Plaintiff Eboni Lucas, on behalf of the MGM Resorts 401(k) Savings Plan, brings this certified class action against MGM Resorts International, the Internal Compensation Committee of MGM Resorts International, and the Administrative Retirement Committee of MGM Resorts International (collectively, MGM).[1]  She alleges that MGM's imprudence resulted in the selection and retention of mutual-fund share classes with unnecessarily high investment costs and that the Plan's recordkeeping expenses were imprudently excessive as well.  MGM moves for summary judgment on Lucas's share-class theory of liability, arguing that its share-class decisions were prudent and didn't result in measurable loss.[2]  It also moves to exclude the opinions of Lucas's expert Cynthia Jones for a number of reasons, but most importantly because her loss calculations don't account for revenue-share dollars that were rebated back to the Plan and used to pay for Plan expenses or reallocated to Plan participants' individual accounts, rendering her methodology unreliable.[3]

---

[1] ECF No. 14 (first amended complaint).

[2] ECF No. 149-1.

[3] ECF No. 150-1.

Despite attaching no evidence to her summary-judgment briefing, Lucas argues that there is sufficient evidence to establish that there is a genuine issue of material fact as to whether MGM's conduct was imprudent.[4]  She also contends that Jones's report establishes that the Plan suffered loss and that Jones's opinion shouldn't be excluded because her calculations were made using a widely accepted methodology and were properly based on Lucas's theory of the case.[5]  Separately, Lucas requests leave to file supplemental authority—a district-court ruling issued after the summary-judgment and *Daubert* motions in this case were fully briefed—in support of her opposition to MGM's summary-judgment motion.[6]  And MGM moves for leave to file excess pages in its summary-judgment-reply brief and asks to seal all of its related briefing.

I grant the motion to supplement and take Lucas's new authority into consideration.  I also grant MGM's unopposed motion for leave to file excess pages but deny its motions to seal because neither Lucas nor any interested non-party has justified sealing or additional redactions.  I grant MGM's motion to exclude Jones's opinions because her methodology was legally flawed and produced inaccurate final calculations that are insufficient to establish that a triable issue of fact exists as to loss.  And because Lucas can't show that the Plan experienced loss related to share-class selection and retention without Jones's excluded opinions, I grant MGM's motion for summary judgment on those claims.  So this case proceeds to trial on Lucas's excessive-recordkeeping-expenses theory of liability only.  But first, I order the parties to a settlement conference with the magistrate judge.

---

[4] ECF No. 161.

[5] *Id.*; ECF No. 154.

[6] ECF No. 168.

**Factual Background**

**A.     The Plan**

This case concerns MGM's management of the MGM Resorts 401(k) Savings Plan. Class representative Lucas is a former MGM employee and former Plan participant.[7]  First established in 1993, the Plan is a defined-contribution retirement plan that permits participants to contribute portions of their annual compensation and direct their contributions into various investment options.[8]  MGM "makes matching contributions equal to 50% of employee contributions up to 6% of eligible compensation."[9]

**B.     MGM's management of the Plan**

The Administrative Retirement Committee of MGM Resorts International is the Plan fiduciary vested with "the authority to control and manage the operation and administration of the Plan."[10]  That authority includes appointing investment managers or advisors and engaging others to "render advice or perform ministerial duties" for the Plan, such as recordkeepers.[11] Throughout the class period, Prudential Retirement Insurance and Annuity Company was the Plan's recordkeeper and provider of other administrative services.[12]  UBS Financial Services,

---

[7] ECF No. 106-5 at ¶¶ 3, 5 (Eboni D. Lucas declaration in support of class certification); ECF No. 92; ECF No. 114.

[8] *See* ECF No. 14 at ¶¶ 47–54: *see also* ECF No. 150-12 at ¶ 31 (expert rebuttal report of Steven K. Gissiner); ECF No. 85-2 (expert report of Eric C. Dyson).  Because Lucas didn't submit a copy of Dyson's report with her summary-judgment briefing despite citing to it extensively throughout, and because Lucas cites to parts of Dyson's report that aren't in the excerpts MGM submitted, I rely on and cite to a copy of this report contained elsewhere in the record.  But I don't consider the portions of Dyson's opinion that were excluded.  *See* ECF No. 104 (excluding Dyson's opinion on damages arising out of advisory fees paid to UBS).

[9] ECF No. 149-1 at 9 (citing ECF No. 14 at ¶¶ 51, 53).

[10] ECF No. 149-3 at 123.

[11] *Id.* at 125.

[12] ECF No. 14 at ¶ 119; *see also* ECF No. 85-2 at ¶ 42; ECF No. 150-12 at ¶ 31.

Inc. served as the Plan's investment advisor.[13]  Renee Fourcade, who is currently a Senior Vice President and Senior Institutional Consultant for UBS, served as the "point person," providing investment advice to the Administrative Committee throughout the class period, though she was supported by other UBS employees.[14]  Fourcade began providing investment advice for the Plan in 1998.[15]

The Administrative Committee held regular quarterly meetings to discuss the Plan and met at other times on an as-needed basis.[16]  In advance of those meetings, Fourcade provided the Administrative Committee with documents that detailed the performance of funds that the Plan offered, expense ratios and fees associated with those funds, and comparisons with other funds' expense ratios.[17]  She also attended these meetings and gave presentations to the Administrative Committee.[18]  Following Fourcade's advice, the Plan adhered to what both parties refer to as the most-efficient-share-class approach, which involved selecting share classes with the lowest net cost after revenue sharing was factored in.[19]

**C.    Mutual-fund share classes and revenue sharing**

This case focuses on particular mutual-fund share classes available to Plan participants. All such funds require Plan participants to pay investment fees to the fund company.  This is accomplished via the fund's expense ratio, which is essentially a set percentage of the investment

---

[13] ECF No. 85-2 at ¶ 42; ECF No. 150-12 at ¶ 31.

[14] ECF No. 149-5 at 9:4–15, 10:10–17.

[15] *Id.* at 6:4–7.

[16] ECF No. 149-6 at 3:4–11; *see also* ECF No. 149-2 at 159–64 (agenda items and minutes from such meetings).

[17] ECF No. 149-6 at 5:12–6:19.

[18] *Id.* at 4:19–24.

[19] ECF No. 149-6 at 7:12–8:2.

in the fund that is extracted from fund assets (i.e., Plan participants' accounts) on an annual basis.[20]  So, "[f]or example, a mutual fund with an expense ratio of .75% [or 75 'basis points'] means that the plan participant will pay $7.50 annually for every $1,000 in assets."[21]  Many mutual funds, however, offer multiple "share classes" of the same fund, and these various share classes may have different expense ratios.  There can be a number of reasons for this.  One key reason is that some share classes, like those at issue in this case, offer varying amounts of revenue sharing (or none at all).[22]

As Lucas's expert Eric Dyson explains, revenue sharing "involves an added expense built into some or all investment offerings in a plan" and "is another method used to pay recordkeeping costs" and other plan expenses.[23]  So a defined percentage of a fund's expense ratio is not used to pay investment fees but rather directed elsewhere by a plan.  As Dyson's report indicates, these revenue-share dollars are often directed to the plan's recordkeeper to cover recordkeeping and other expenses, as the Plan here did prior to 2018.[24]  And some plans, including the one at issue here, reallocate excess revenue-share dollars not used for recordkeeping or other expenses directly back to plan participants' individual accounts.[25]  The parties' experts agree that revenue sharing is, at least in the abstract, a permissible way for defined-contribution plans to fund recordkeeping and other administrative expenses.[26]

---

[20] ECF No. 150-3 at ¶ 15.

[21] ECF No. 14 at ¶ 68; *see also* ECF No. 149-1 at 10.

[22] ECF No. 150-3 at ¶ 19

[23] ECF No. 85-2 at ¶¶ 32–33.

[24] *Id.*; *see also* ECF No. 150-3 at ¶ 60.

[25] ECF No. 150-12 at ¶ 60.

[26] ECF No. 150-3 at ¶ 19; ECF No. 85-2 at ¶¶ 32–33.

But starting in 2018 the Plan modified its revenue-sharing arrangement.  It began using a separate, fixed-percentage fee that was charged to all participants' individual accounts for recordkeeping and other administrative expenses.[27]  And since the revenue-share dollars were no longer being used for such expenses, the Plan began crediting back all revenue-share dollars directly to Plan participants' individual accounts on a pro rata basis.[28]  The parties refer to this change in approach as "fee levelization."

### Procedural History

Lucas, on behalf of the Plan, asserts breach-of-fiduciary-prudence and failure-to-monitor claims under ERISA.[29]  Both causes of action have two distinct underlying theories of liability. One, which the parties have dubbed the "share-class" theory, relates to the allegedly imprudent selection and retention of particular mutual-fund share classes over others with lower expense ratios.[30]  The second concerns the Plan purportedly paying excessive recordkeeping fees.[31]  The gravamen of Lucas's complaint is that the Administrative Committee breached its duty of prudence, causing the Plan to suffer losses in the form of excessive investment fees and recordkeeping expenses, and that MGM Resorts and the Compensation Committee failed to adequately monitor the Administrative Committee and prevent or limit loss to the Plan.[32]  Lucas moved for class certification in September 2022, which MGM didn't oppose.[33]  I conducted a

---

[27] ECF No. 150-12 at ¶ 62; ECF No. 150-3 at 22; ECF No. 85-2 at 51.

[28] ECF No. 150-12 at ¶ 62.

[29] ECF No. 14 at ¶¶ 140–53.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] ECF No. 105 (amended motion to certify class).

hearing on that motion the following month, during which I appointed Lucas as the sole class representative and certified the following class:

> [A]ll persons . . . who were participants in or beneficiaries of the MGM Resorts 401(k) savings plan at any time between September 22[], 2014, through judgment in this action and who have not released their claims.[34]

Discovery has closed, and MGM now moves for partial summary judgment solely on Lucas's share-class theory of liability, so her excessive-recordkeeping-expenses theory necessarily proceeds to trial.[35]  It also moves to exclude the opinions of Lucas's expert Cynthia Jones,[36] seal its summary-judgment and *Daubert* briefing and all related exhibits,[37] and for leave to file an extra-long summary-judgment reply.[38]  Lucas opposes MGM's summary-judgment and *Daubert* motions[39] and separately requests leave to file supplemental authority in support of its responsive summary-judgment and *Daubert* briefing.[40]

---

[34] ECF No. 122 at 26:3–14.  But "members of the Board of Directors of MGM Resorts International," "members of the Internal Compensation Committee of MGM Resorts International," "members of the Administrative Committee of MGM Resorts International," and the immediate family of any of those committee and board members are excluded from the class definition.  *Id.*

[35] ECF No. 149-1.

[36] ECF No. 150-1.

[37] ECF No. 149; ECF No. 150.

[38] ECF No. 166.

[39] ECF No. 154; ECF No. 161.

[40] ECF No. 168.

**Discussion**

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[41]  When considering a summary-judgment motion, the court must view all facts and draw all inferences in the light most favorable to the nonmoving party.[42]  When the moving party does not bear the burden of proof on the dispositive issue at trial, it is not required to produce evidence to negate the opponent's claim—its burden is merely to point out the evidence showing the absence of a genuine material factual issue.[43]  The movant need only defeat one element of a claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[44]

**A.      Lucas can't show that there is a genuine factual issue of loss for her share-class theory of liability.**

A fiduciary of an ERISA-governed plan must "discharge his or her duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use."[45]  When determining if fiduciaries have satisfied their duty of prudence, "the primary question is whether [they], 'at the time they engaged in the challenged transactions, employed the appropriate methods to

---

[41] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

[42] *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[43] *Celotex*, 477 U.S. at 323.

[44] *Id.* at 322.

[45] *California Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1043 (9th Cir. 2001) (quoting 29 U.S.C. § 1104(a)(1)(B)) (cleaned up).

investigate the merits of the investment and to structure the investment.'"[46]  There is also a

"continuing duty of prudence imposed on plan fiduciaries by ERISA" that requires them to

reevaluate plan investments at regular intervals[47] and "remove an imprudent investment from the

plan within a reasonable time."[48]

29 U.S.C. § 1109 makes a fiduciary for an ERISA-governed plan who breaches the duty

of prudence "personally liable to make good to such plan any losses to the plan resulting from

each such breach."[49]  Plan participants can bring civil actions to recover losses on behalf of their

plan under this section of ERISA,[50] as Lucas has here.  But it doesn't provide individual

remedies for plan participants.[51]  Rather, "remedies under § 1109 'protect the entire plan.'"[52]

MGM argues that summary judgment is warranted on the portion of Lucas's breach-of-

prudence claim that is based on the selection and retention of particular share classes over

others.[53]  It contends that loss is a necessary element for such a claim and that Lucas hasn't

presented evidence creating a genuine dispute as to whether the Plan suffered loss related to the

particular investment choices she is challenging.[54]  Lucas doesn't dispute that she must show

loss for this theory of liability to survive, but she contends that she has presented evidence of it

---

[46] *Id.* (quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983)).

[47] *Id.* at 1194, 1197.

[48] *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022).

[49] 29 U.S.C. § 1109.

[50] *Id.* at § 1132(a)(2); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009); ECF No. 105 at 8 (motion for class certification).

[51] *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996).

[52] *Braden*, 588 F.3d at 593 (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142, 142 n.9 (1985)).

[53] ECF No. 149-1.

[54] *Id.* at 34–37.

in the form of her expert Jones's report.[55]  Lucas thus relies solely on Jones's "fee differential" calculations to show loss.[56]  In her report, Jones includes several paragraphs for each at-issue share class in her report stating what the expense-ratio differential was between it and her proposed alternative, explaining how she multiplied this differential by "the investment balance in the fund" at the end of the relevant years, and including her final aggregate calculations, which also reflect what these dollars would have earned if "reinvested at the rate of the return" for her proposed alternative investments.[57]  Lucas theorizes that Jones properly relied on her counsel's instructions to not consider revenue sharing in some (but not all) of her calculations and used a broadly accepted methodology and that this "is ultimately an issue for the trier of fact" and "another classic example of the 'battle of the experts.'"[58]

While Jones opined that excessive fees resulted in losses, MGM takes the position that Jones's methodology is junk: she didn't properly balance out these initial charges with the revenue-sharing dollars rebated to the Plan for a portion of the class period and used for the benefit of the Plan.[59]  According to MGM's experts, the evidence demonstrates that once the financial benefits of revenue-sharing have been accounted for, these share classes provided the Plan with net benefits, not net losses.[60]

---

[55] ECF No. 161 at 29–32.

[56] *Id.*

[57] *See, e.g.*, ECF No. 150-2 at ¶¶ 38–39.

[58] *Id.*

[59] ECF No. 149-1 at 34–37.

[60] *Id.*

### 1.   *Revenue sharing provided the Plan with financial benefits that must be accounted for when measuring loss.*

Across their summary-judgment and *Daubert* briefing, the parties dispute whether Jones's calculations are flawed because she accounted for revenue sharing only after 2017.[61] Jones initially provided several reasons for this seemingly contradictory approach[62] but ultimately testified in deposition that she did so because plaintiff's counsel told her to and that this was consistent with Lucas's theory of the case.[63]  Much of the parties' briefing was therefore focused on when experts can properly rely on the *ipse dixit* of counsel and when doing so erodes the reliability of the experts' findings to such an extent that exclusion is warranted.  But all of the cases Lucas cites for this point in her summary-judgment and *Daubert* briefing are materially distinguishable, as they all focused on damages experts being asked to assume certain facts in order to calculate damages,[64] while Jones was asked to apply a particular methodology—one that she refused to actually adopt.

---

[61] MGM argues in its reply that the court can't consider Lucas's expert reports because she failed to properly authenticate them.  See ECF No. 167 at 8.  Though I question the continuing viability of that line of cases after the 2010 amendments to Rule 56, I need not and thus do not reach this issue because I find that, even when I consider Lucas's expert reports, summary judgment for MGM is warranted.

[62] Jones initially said at deposition that this decision was based on the complaint and Dyson's report, but she later was unable to identify anything in either that supported her approach.  ECF No. 150-4 at 13:7–10, 17:17–23.

[63] *Id.* at 13:7–14:7, 17:4–11.

[64] *See* ECF No. 161 at 30 (citing *United States ex rel. Jordan v. Northrop Grumman Corp.*, 2003 WL 27366224, at *6 (C.D. Cal. Jan. 6, 2003), in which the court refused to exclude a damages expert's report that relied on *factual* assumptions that were "based on the work of other experts" or provided by counsel, noting that the report was "the product of a reliable methodology"); *id.* (citing *United States v. Pac. Health Corp.*, 2018 WL 1026361, at *4 (C.D. Cal. Feb. 20, 2018), in which the court refused to exclude a damages expert's report because the expert made *factual* assumptions consistent with his employer's case); *id.* (citing *SiteLock LLC v. GoDaddy.com LLC*, 562 F. Supp. 3d 283, 329 (D. Ariz. 2022), in which the court refused to exclude a damages

1

2

### a.   *Jones's loss opinion is based on a methodology supplied by plaintiff's counsel and which even Jones doesn't adopt.*

3   The problem with Jones's opinion isn't that Lucas's counsel has asked Jones to assume

4   facts in order to assess loss—the facts relevant to this specific issue aren't in dispute.  Lucas

5   doesn't argue or submit evidence that, for example, the at-issue share classes didn't have revenue

6   sharing at all or had different amounts of revenue sharing than those in MGM's evidence.  Nor

7   does MGM argue that Jones's opinion is inadmissible because she assumed that a breach

8   occurred or certain share-class selection and retention decisions were imprudent.

9   Instead, Lucas's counsel directed Jones to ignore the revenue-share dollars that were

10  refunded to the Plan when calculating losses.  Tellingly, Jones herself refused to opine at

11  deposition that she believed that this is how losses should be calculated, testifying that it was not

12  her "opinion or position to say that," in assessing loss, the parties "should or should not be

13  netting out revenue share."[65]  So the pertinent question here is whether the methodology that

14  Jones applied but refused to actually endorse, and which was supplied to her by Lucas's counsel,

15  is in accord with the law on measuring loss for a breach-of-fiduciary-prudence claim brought

16  under § 1109.  And the court need not wait for trial to answer that question if Jones's decision to

17  completely ignore revenue sharing for a substantial part of the class period—and, significantly,

18  the period from which almost all of the losses Jones's finds arise out of—is a methodology that

19

20

21

22  expert's report because SiteLock had "reasonably asked" the expert "to assume *facts* that align with its view of the controversy" (emphasis added)); ECF No. 154 at 17–19 (same).

23  [65] ECF No. 150-4 at 17:4–11 ("[I]t is not my opinion or position to say that we should or should not be netting out revenue share."); *see also id.* at 19:14–22 ("It's not—I do not believe as in that's my opinion on how things should be done, but in this case that's what the allegation is.").

1  is incorrect as a matter of law.[66]  As the gatekeeper, the trial judge must exclude an expert

2  opinion based on an unreliable methodology.[67]

3
### b.  *Jones's methodology is unreliable because she didn't account for*
4  *revenue-sharing benefits, as the law requires.*

5  The only substantive support that Lucas provides for not netting out *any* revenue-share

6  dollars for the first four years of the class period is that Jones used "a broadly accepted

7  methodology outlined in *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985)."[68]  Lucas goes on

8  to explain that Jones's calculations involved "comparing the expense ratio differential between

9  Plan investments . . . and other similar investments available to the Plan that carried lower

10 expense ratios," applying this "differential to dollar balances invested in Plan investments," and

11 then determining what the dollar amount this produced would be "if it was reinvested through

12 the end of the relevant period."[69]  Jones does indeed reference *Donovan* in her report.[70]  But the

13 excerpt she cites merely stands for the proposition that loss calculations should include any

14 dollars lost directly from imprudent investments *and* what the Plan would have earned on them if

15 they had been "available for other Plan purposes" and properly invested, which isn't in dispute

16 here.[71]  *Donovan* involved a plan's trustees using plan funds to purchase more than a million

17

---

18 [66] *See, e.g., Senne v. Kansas City Royals Baseball Corp.*, 591 F. Supp. 3d 453, 488 (N.D. Cal. 2022) (finding expert's "method of allocating offsets" was "incorrect as matter of law" and thus
19 inadmissible); *Jordan*, 2003 WL 27366248, at *5 (declining to exclude an expert report because the court didn't find the expert's methodology was "incorrect a matter of law").

20 [67] *United States v. Valencia-Lopez*, 971 F.3d 891, 900 (9th Cir. 2020) (citing *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002)).
21
22 [68] ECF No. 161 at 31.

[69] *Id.*

23 [70] ECF No. 150-2 at ¶ 9.

[71] *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985).  While both Jones and Lucas assert that *Donovan* provides a methodology for calculating damages, it actually provides guidance on

shares of a company in which they were "high ranking officials" in an effort to stave off a tender offer.[72]  It didn't address revenue sharing or deal with expense-ratio-based loss calculations in a challenge to share-class selection.[73]  So *Donovan* doesn't support the proposition that Jones's calculations shouldn't account for revenue share.

On the contrary, *Donovan* indicates that Jones's report provides an inherently flawed assessment of loss because she didn't account for revenue-share dollars.  The *Donovan* court recognized that the appropriate remedy for a breach of fiduciary duty is "restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust."[74]  In an ERISA action under § 1109, measuring loss involves a comparison of the position the Plan is currently in to the position it would have been in but for the complained-of breach of prudence.[75] The Ninth Circuit has likewise found that there aren't compensable losses when plaintiffs fail to demonstrate that "their current positions are any different than they would have been without"

---

how to measure *losses* under ERISA.  *Id.* ("[W]e hold that the *measure of loss* applicable under ERISA section 409 requires comparison of what the Plan actually earned on the [imprudent] investment with what the Plan would have earned had the funds been available for other Plan purposes." (emphasis added)).  Measuring loss is what Jones is attempting to do in her report. And these terms aren't necessarily interchangeable in this context, though that is not a pertinent issue here.  *See Sacerdote v. New York Univ.*, 9 F.4th 95, 112 (2d Cir. 2021) ("The question of how much money should be awarded to the plaintiffs in damages is distinct from, and subsequent to, whether they have shown a loss.").

[72] *Id.* at 1050–51.

[73] *See generally id.*

[74] *Id.* at 1056.

[75] *See id.* ("[T]he measure of loss applicable under ERISA section 409 requires a comparison of what the Plan actually earned . . . with what the Plan would have earned if the funds been available for other Plan purposes."); *see also Sacerdote v. New York Univ.*, 9 F.4th 95, 112 (2d Cir. 2021) ("Loss is measured in this context by 'a comparison of what the [p]lan actually earned on the . . . investment with what the [p]lan would have earned had the funds been available for other plan purposes.  If the latter amount is greater than the former, the loss is the difference between the two.'" (quoting *Donovan*, 754 F.2d at 1056)).

the purportedly imprudent conduct.[76]  Jones's methodology of using only expense-ratio

differentials breaks down when the requisite approach to measuring loss is properly considered

in this case.

> ### c.    *Ignoring revenue-sharing benefits to find a loss creates an improper windfall.*

The most obvious problem with Jones's decision to ignore revenue sharing is the fact

that, from 2014 to 2017, portions of the revenue-share dollars that were generated as part of the

at-issue share classes' expense ratios were reallocated back to Plan participants' individual

accounts.  MGM's expert Steven Gissiner found that more than $1.6 million revenue-share

dollars were returned to Plan participants during this timeframe, and on this issue his report

stands unrebutted.[77]  Because Jones relied exclusively on expense ratios to measure loss for this

period, ignoring the return of those $1.6 million revenue-share dollars, her conclusions don't

accurately reflect the position that the Plan is currently in as a result of any share-class-selection

related breach.[78]  Nor do they accurately reflect the position the Plan would have been in but for

any such breach because all other revenue-share dollars were used to defray Plan expenses—

expenses that participants otherwise would have been assessed separately, as they were after

2017.[79]  So allowing the Plan to recover losses based solely on expense-ratio differentials

---

[76] *Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1167 (9th Cir. 2012) ("The beneficiary can purse the remedy that will put the beneficiary in the position he or she would have attained but for the trustee's breach.").

[77] ECF No. 150-12 at 35, Fig. 3.

[78] *See, e.g.*, *Ramos v. Banner Health*, 1 F.4th 769, 783 (10th Cir. 2021) (offsetting revenue-share "credits" that recordkeeper returned to plan when measuring loss).

[79] Notably, the supplemental authority Lucas submitted also suggests that it is the share classes' *net cost* to the Plan that is relevant in such cases.  *See In re Prime Healthcare Erisa Litig.*, 2023 WL 6787806, at *3 (C.D. Cal. Sept. 19, 2023) (finding genuine issue of fact regarding loss when

without accounting for these financial benefits would provide the Plan and its participants with an improper windfall.  Even Lucas's own expert Dyson seems to recognize this, as he agreed at his deposition that revenue sharing should be considered when calculating losses for Lucas's share-class theory of liability and testified that it was his understanding that Jones had done so.[80] Indeed, "[t]he aim of ERISA is 'to make the plaintiffs whole, but not give them a windfall.'"[81]

Of course, "[w]hen expenses are paid from plan assets, fiduciaries must ensure that the assets are used 'for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan.'"[82]  But Lucas hasn't presented evidence that the Plan's fiduciaries misappropriated revenue-share dollars or (excepting the sums reallocated directly to Plan participants) used them for something other than paying for recordkeeping and other Plan expenses.[83]  That isn't to say that the Plan didn't suffer loss

---

there was evidence that, when net costs of particular plan investments were considered, "there were less expensive share class available that [Defendants] could have selected").

[80] *See* ECF No. 149-12 at 10:1–6, 3:1–3.

[81] *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 624 (2d Cir. 2006) (Sotomayor, J.) (quoting *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000)).

[82] *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 329 (3d Cir. 2019) (quoting DOL Advisory Opinion 2001-01A, 2001 WL 125092, at *1).

[83] Dyson did initially opine that the Plan's approach to revenue sharing resulted in a process that "fails to return 100% of all revenue share back to participants."  *See* ECF No. 85-2 at ¶ 44.  But he later clarified that this statement was "inaccurate" and that he wasn't "claiming that [money] was not returned to the plan and to participants in general" but rather some former participants may have not received some revenue-share reallocations or credits they were due if they terminated their accounts before those reimbursements were made.  *See* ECF No. 149-12 at 3:7–25; ECF No. 167-3 at 4-5.  Lucas block quotes a portion of Dyson's deposition in which he apparently explains this issue further, but she didn't submit these deposition pages with her summary-judgment briefing.  *See* ECF No. 161 at 28.  Regardless, Dyson's opinion that some unknown former Plan participants hypothetically may not have received some revenue-share dollars they were eligible for is highly speculative and something that Dyson himself testified he hadn't evaluated and would need "an insane amount of data" to analyze.  ECF No. 149-12 at 3:24–25.  More importantly, this doesn't suggest that there were losses *to the Plan*.  Indeed,

stemming from the *use* of these rebated revenue-share dollars if the expenses they were directed towards are themselves found to be unreasonably excessive. But that is a separate issue from whether the selection and retention of share classes with revenue sharing resulted in the fee-differential losses that Jones finds, and one that Lucas is already seeking plan-wide relief for through her excessive-recordkeeping-expenses theory of liability.

Lucas's theory of the case is that the financial benefits that revenue sharing provided shouldn't be considered in assessing loss in some (but not all) circumstances. But those benefits stem from the very same allegedly imprudent decisions that Lucas is challenging as part of her share-class theory of liability. They can't be disregarded solely because Lucas says they should be, especially when she provides no substantive support or reasoned explanation for such a position. As a result, Jones's final pre- and post-reinvestment calculations—even viewed in the light most favorable to Lucas—are simply insufficient to create a genuine issue of material fact as to loss because they completely disregard revenue sharing across four years of the class period. They don't realistically portray the difference between the Plan's current position and the position it would have been in but for any allegedly imprudent share-class selection decisions. And because Jones's methodology for measuring loss before 2018 is incorrect as a matter of law and thus unreliable, I exclude the parts of her opinion that rely on this methodology and any fee-differential losses that arise out of them.[84]

---

Dyson agreed that all revenue share was returned to the Plan and distributed among active Plan participants. ECF No. 167-3 at 4:23–5:3.

[84] *See Valencia-Lopez*, 971 F.3d at 900 (citing *Hermanek*, 289 F.3d at 1093; *see also Senne v. Kansas City Royals Baseball Corp.*, 591 F. Supp. 3d 453, 488 (N.D. Cal. 2022) (finding expert's "method of allocating offsets" was "incorrect as matter of law" and thus inadmissible)

### 2.    With Jones's opinions excluded, the evidence indicates that the share classes MGM selected provided net benefits, not losses.

The only experts to provide reports that consider and account for revenue sharing before 2018 are MGM's.  Expert D. Lee Heavner explains that once pre-2017 revenue sharing is considered and various mathematical errors (that Jones concedes she made)[85] are corrected, the fee-differential losses that Jones finds are reduced "by approximately 95%."[86]  Heavner further states that there would only be one year (2016) in which a single share class for one fund—T. Rowe Price Growth Stock Fund—had a higher net cost than the alternative share class Jones proposed.[87]  But this was only by a single basis point (i.e., .01% differential), and from 2018 to 2021 the Plan's revenue-sharing share class provided net benefits that exceeded that amount.[88]

### 3.    A collective-investment trust is not a proper comparator.

The only post-2017 losses that potentially remain all stem from the selection and retention of a Lazard International Equity Fund mutual-fund share class (with revenue sharing) instead of Jones's proposed alternative, a collective-investment trust (CIT) version of the fund, from 2019 to 2021.[89]  In its *Daubert* motion, MGM contends that comparing its share class to a CIT is "improper" because a CIT is "a wholly different investment," Lucas hasn't "offered any expert to opine that the Plan should have invested in a CIT," and she never alleged that MGM

---

[85] *See, e.g.*, ECF No. 150-4 at 9:1–6, 26:14–20, 28:24–29:9, 29:22–32:18.

[86] ECF No. 150-3 at ¶ 37.

[87] *Id.* at ¶¶ 43–44.

[88] ECF No. 150-3 at 31; *see also id.* at ¶ 44 (noting that "the Investor share class's net cost was lower than or equal to the net cost of the I class in six of the seven years for which data are available" and this "demonstrate[s] that there is no economically sound basis for" finding "share class fee damages for this fund"); ECF No. 149-1 at 35 n.13.

[89] ECF No. 150-2 at ¶ 23.

"should have invested in CITs instead of mutual funds."[90]  Lucas's response is that MGM didn't provide caselaw supporting its argument that a CIT is an improper comparator and that this "is an issue of fact for trial."[91]

Again, Jones's methodology is too flawed to permit this court to rely on her opinion. This case has centered on the selection and retention of *mutual-fund* share classes that, except for their expense ratios, are generally identical.[92]  CITs are a distinct type of privately held investment vehicle and are not mentioned once in the complaint.[93]  This may be because "courts have repeatedly recognized that collective trusts differ so much from mutual funds . . . in terms of their regulatory and transparency features that other courts have found it impossible to make an apples-to-oranges comparison of the two."[94]  Mutual funds, for example, "have a variety of unique regulatory and transparency features that make it an apples-to-oranges comparison to judge them against" privately held trusts like CITs.[95]  Indeed, CITs "are not subject to reporting, governance, and transparency requirements of the Securities Act of 1933 and the Investment

---

[90] ECF No. 150-1 at 13.

[91] ECF No. 154 at 19.

[92] *See* ECF No. 14; *id.* at ¶¶ 77–95; ECF No. 105 at 12.

[93] *See* ECF No. 14; *see also Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 908 (9th Cir. 2011) (when expert opines on a new theory of liability not pled in complaint, Rule 8 "preclude[s] consideration" of this part of the report"); *Persian Gulf, Inc. v. BP W. Coast Prod., Inc.*, 2020 WL 7427057, at *2 (S.D. Cal. Dec. 17, 2020) (striking a portion of an expert report that advanced additional theory of liability not alleged in the complaint).

[94] *Tobias v. NVIDIA Corp.*, 2021 WL 4148706, at *12 (N.D. Cal. Sept. 13, 2021) (cleaned up) (collecting cases; dismissing a theory of liability based on a failure to offer CITs with lower costs rather than selected mutual funds).

[95] *See Tibble v. Edison Int'l (Tibble I)*, 729 F.3d 1110, 1134 (9th Cir. 2013), *vacated on other grounds*, 575 U.S. 523 (2015); *see also White v. Chevron Corp.*, 2016 WL 4502808, at *12 (N.D. Cal. Aug. 29, 2016) ("In particular, mutual funds have unique regulatory and transparency features, which make any attempt to compare them to investment vehicles such as collective trusts . . . an 'apples-to-oranges comparison.'" (quoting *Tibble I*, 792 F.3d at 1134)).

Company Act of 1940."[96]  Accordingly, courts have found that "it is 'inappropriate to compare [these] distinct investment vehicles solely by cost, since their essential features differ so significantly.'"[97]

So there is an abundance of authority suggesting that CITs generally aren't proper comparators for mutual-fund share classes, which is grounds for exclusion.[98]  And neither Jones nor Lucas attempts to explain why such a comparison is appropriate or reliable in this case.[99]  I therefore exclude Jones's Lazard-CIT comparison and the fee-differential losses that purportedly arise out of it from summary-judgment consideration.  And since I have also excluded Jones's 2014-to-2017 calculations, which don't accurately reflect loss because they don't account for revenue share at all, this leaves only MGM's expert opinion evidence and data indicating that the at-issue share classes provided net benefits over Jones's proposed share-class alternatives, and no reliable evidence of any Plan-wide loss either before or after 2017.[100]  This record, even viewed

---

[96] *Tobias*, 2021 WL 4148706, at *12 (citations omitted).

[97] *Id.* (quoting *White*, 2016 WL 4502808, at *12).

[98] *See Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233, 254 (2d Cir. 2021) (finding that "expert testimony should be excluded" when it is "based on assumptions that are so unrealistic and contradictory" that it is "in essence an apples and oranges comparison." (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *Goodness Films, LLC v. TV One, LLC*, 2014 WL 12780291, at *2 (C.D. Cal. May 19, 2014) ("When conducting a comparative analysis, to meet the reliability that Daubert demands, an expert must select samples that are truly comparable. To put it another way, care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'" (quoting *State Farm Fire & Cas. Co. v. Electrolux Home Prods.*, 980 F. Supp. 2d 1031, 1049 (N.D. Ind. 2013)); *Shimozono v. May Dep't Stores Co.*, 2002 WL 34373490, at *8 (C.D. Cal. Nov. 20, 2002) (apples-to-oranges comparison warrants exclusion of expert opinion).

[99] *See Cunningham v. Cornell Univ.*, 86 F.4th 961, 982 (2d Cir. 2023) (upholding exclusion of expert opinions on recordkeeping fees when the experts didn't "explain[] how the[] putative comparators were selected").

[100] While Jones initially opined that there may also be losses from "excessive asset-based administrative fees," *see* ECF No. 150-2 at ¶¶ 45–47, she later retracted that opinion.  *See* ECF No. 150-4 at 3:8–16.  Indeed, it appears she initially thought the revenue-share portion of certain share classes' expense ratios was an additional cost rather than something that was rebated back

in the light most favorable to Lucas, fails to establish a genuine issue of material fact as to loss for Lucas's share-class theory of liability.[101]

**B.      With no evidence of related loss, summary judgment is warranted on Lucas's share-class claims.**

MGM argues that loss is a "necessary element" of Lucas's share-class claims.[102]  Lucas doesn't deny this particular point in her summary-judgment briefing,[103] and the Ninth Circuit has held that "ERISA holds a trustee liable for a breach of fiduciary duty only to the extent that losses to the plan result from the breach."[104]  Yet some courts have suggested that loss isn't necessary for a breach-of-fiduciary-prudence claim to be viable if the plaintiff is seeking equitable relief,[105] and Lucas has prayed for various forms of equitable relief in this case in

---

to the Plan to be used for other purposes.  *Compare* ECF No. 150-2 at ¶ 45 *with* ECF No. 150-3 at 28.

[101] Dyson also opines that using revenue-sharing share classes can be imprudent because amounts that are ultimately reallocated or credited back to plan participants sit for a period of time in a plan account and thus, at least for some window of time, "are not invested per the participants' choice."  *See* ECF No. 85-2 at ¶¶ 38, 47.  That this could result in some loss is potentially a viable theory.  *See, e.g., In re Omnicom Grp. Inc. Erisa Litig.*, 2022 WL 18674830, at *12 (S.D.N.Y. Dec. 23, 2022).  But neither Dyson nor Jones develops it or calculates loss based on the periods of time certain revenue-share dollars were held outside of Plan participants' accounts before being returned to them, so it is entirely unclear how long certain tranches of revenue-share dollars were held in Plan accounts before being returned to Plan participants, what those funds would have earned if they would have been invested during those periods, or whether any potential investment earnings would have exceeded the net benefits that the revenue-sharing share classes provided.

[102] ECF No. 149-1 at 34–36.

[103] *See generally* ECF No. 161.

[104] *Friend v. Sanwa Bank California*, 35 F.3d 466, 469 (9th Cir. 1994) (citing 29 U.S.C. § 1109; *Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982)); *see also Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 30 (1st Cir. 2018) (noting that a breach-of-fiduciary-prudence claim under ERISA "has three elements: breach, loss, and causation").

[105] *See, e.g., Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *7 (S.D.N.Y. Sept. 27, 2019) ("Breach of fiduciary duty without proof of loss may warrant [a] grant of equitable relief.") (citing *Brock v. Robbins*, 830 F.2d 640, 647–48 (7th Cir. 1987); *Liss v. Smith*, 991 F. Supp. 278,

addition to monetary relief.[106]  While I question whether some of the equitable remedies that

Lucas seeks would be available on these facts,[107] I don't need to reach that issue for two reasons.

First, Lucas didn't argue that her share-class theory can survive in the absence of related

loss.  So assuming this were a valid argument, she waived it by not raising it on summary

judgment or explaining why the Plan is entitled to such relief.[108]  But even if it wasn't waived,

Lucas's failure to present evidence of loss at this stage creates a second problem: standing.

"Article III standing requires a concrete injury even in the context of a statutory violation."[109]

---

295 (S.D.N.Y. 1998)), *aff'd*, 86 F.4th 961 (2d Cir. 2023); *Peters v. Aetna Inc.*, 2 F.4th 199, 219 (4th Cir. 2021) (finding plaintiff could pursue a breach-of-fiduciary-duty claim even if she "failed to demonstrate a financial injury" because she also sought remedies of "surcharge, disgorgement, and declaratory and injunctive relief"); *see also Shaver v. Operating Eng'rs Loc. 428 Pension Tr. Fund*, 332 F.3d 1198, 1203 (9th Cir. 2003) (finding that an ERISA case in which purely equitable relief was sought for failure to keep adequate records could proceed without allegations of loss).

[106] ECF No. 14 at 43–44 (prayer for disgorgement, declaratory relief, injunctive relief, and removal of plan fiduciaries).

[107] *See, e.g., Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 958 (9th Cir. 2014) (finding that ERISA-plan participants were not entitled to disgorgement without evidence that the fiduciary "gained a benefit" from the complained-of conduct); *U.S. Sec. & Exch. Comm'n v. Murphy*, 50 F.4th 832, 852 (9th Cir. 2022) ("[O]bey the law" injunctions are only appropriate when "the statutory terms adequately describe the impermissible conduct." (quoting *United States v. Miller*, 588 F.2d 1256, 1261 (9th Cir. 1978)).

[108] *See BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.*, 531 F. App'x 784, 786–87 (9th Cir. 2013) ("By failing to raise this argument in opposition to summary judgment, however, BlueEarth waived it." (citing *Ruiz v. Affinity v. Logistics Corp.*, 667 F.3d 1318, 1322 (9th Cir. 2012)) (unpublished); *Soriano v. Countrywide Home Loans, Inc.*, 2011 WL 2175603, at *3 (N.D. Cal. June 2, 2011) ("[W]hen a party faces a burden in opposing a motion for summary judgment, waiver can occur if the party fails to carry that burden by making argument or introducing evidence."); *see also Cunningham v. Cornell Univ.*, 86 F.4th 961, 982 (2d Cir. 2023) (affirming summary judgment on duty-of-prudence claim for "failure to show loss" despite plaintiffs also seeking equitable relief because they had "failed to make this argument" to the district court "and thus c[ould] be inferred to have abandoned it" (citing *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014)).

[109] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016); *see also Thole v. U. S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020) ("There is no ERISA exception to Article III standing.").

And because "the elements of Article III standing must be substantiated with the manner and degree of evidence required at the successive stages of the litigation . . . at the summary[-]judgment stage, a plaintiff must offer evidence of specific facts demonstrating each element of Article III standing."[110]  Throughout the duration of this case, standing has been premised on allegations that various breaches caused the Plan to suffer losses, which in turn injured Plan participants by reducing the value of their individual accounts.[111]  Indeed, this is the basic theory of liability upon which her breach-of-prudence claim is based.  By failing to present evidence of plan-wide losses related to share-class selection and retention at this stage, Lucas hasn't supported her allegations with evidence of a concrete injury-in-fact.[112]  So I grant summary judgment for MGM on Lucas's claims to the extent that they are based on share-class selection and retention.[113]

---

[110] *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1058 (9th Cir. 2023) (internal citations omitted) (cleaned up).

[111] *See* ECF No. 14 at ¶¶ 21, 144 (first amended complaint); ECF No. 105 at 10 (motion for class certification) (arguing that the plaintiffs have standing because they are all former participants in the Plan and allege that "'the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns' and '[h]ad the [] Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.'" (quoting ECF No. 14 at ¶ 144)); ECF No. 106-5 at ¶ 7 (Eboni Lucas declaration) ("I decided to bring this action to recover losses that the Plan sustained . . . ."); *id.* at ¶ 4 ("I understand that this case is a class action lawsuit against MGM and other Defendants to recover losses to the Plan . . . .").

[112] *See Sabana v. CoreLogic, Inc.*, 2024 WL 755723, at *6 (C.D. Cal. Jan. 26, 2024) (ERISA plaintiff's "ancillary prayers for declaratory and injunctive relief do not sanction an end-run around the injury-in-fact requirement" when "basic theory of liability" was that fiduciaries' "imprudent actions have cost the plan money, and they should pay for the damage"); *see also Winsor v. Sequoia Benefits & Ins. Servs. LLC*, 2021 WL 5053087, at *5 (N.D. Cal. Nov. 1, 2021), *aff'd*, 62 F.4th 517 (9th Cir. 2023).

[113] *See Davis v. Salesforce.com, Inc.*, 2022 WL 1055557, at *2 (9th Cir. Apr. 8, 2022) (failure-to-monitor cause of action is derivative of duty-of-prudence cause of action); *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133, 1162 (N.D. Cal. 2022) (same); *see also* ECF No. 14 at ¶ 151.

**C.      MGM's motions to seal**

"The public has a 'general right to inspect and copy public records and documents including judicial records and documents.'"[114] "Although the common law right of access is not absolute, '[courts] start with a strong presumption in favor of access to court records.'"[115] "A party seeking to seal judicial records can overcome the strong presumption of access by providing 'sufficiently compelling reasons' that override the public policies favoring disclosure."[116] "When ruling on a motion to seal court records, the district court must balance the competing interests of the public and the party seeking to seal judicial records."[117]

MGM filed motions to seal along with its summary-judgment and *Daubert* motions, and the entirety of those motions and all accompanying exhibits remain under seal.[118] The sealing of all these filings, including the motions to seal, was improper and certainly overkill, and it has resulted in a docketing mess. Despite all those sealed filings, MGM is not seeking to keep its "own information secret from public disclosure" and concedes that it has "no evidentiary support for" its requests to seal.[119] Instead, it filed these motions and exhibits under seal "to provide an opportunity for [Lucas] and any interested non-parties to move for additional redactions."[120] But neither Lucas nor any interested non-party has done so since these motions and exhibits were filed ten months ago. I interpret that silence on the sealing issue as the plaintiff's and any

---

[114] *In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (quoting *Nixon v. Warner Commcns., Inc.*, 435 U.S. 589, 597 (1978)).

[115] *Id.* (quoting *Foltz v. St. Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)).

[116] *Id.* (quoting *Foltz*, 331 F.3d at 1135).

[117] *Id.* (citing *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006)).

[118] ECF No. 149 and exhibits; ECF No. 150 and exhibits.

[119] ECF No. 149 at 3; ECF No. 150 at 3.

[120] ECF No. 149 at 3; ECF No. 150 at 3.

interested non-party's concession that sealing is unwarranted.  And with no support for sealing, the record does not overcome the strong presumption of access, and I deny MGM's motions to seal.

### Conclusion

IT IS THEREFORE ORDERED that MGM's motion for partial summary judgment **[ECF No. 149-1] is GRANTED** on Eboni Lucas's breach-of-fiduciary-prudence and failure-to-monitor claims to the extent that they are based on share-class selection and retention.  To the extent that these claims are based on excessive recordkeeping expenses, they proceed to trial.

IT IS FURTHER ORDERED that MGM's motion to exclude expert witness Cynthia L. Jones **[ECF No. 150-1] is GRANTED.**

IT IS FURTHER ORDERED that MGM's unopposed motion for leave to file excess pages **[ECF No. 166] is GRANTED**.

IT IS FURTHER ORDERED that Lucas's motion for leave to file notice of supplemental authority **[ECF No. 168] is GRANTED.**

IT IS FURTHER ORDERED that MGM's motions to seal **[ECF No. 149, ECF No. 150] are DENIED.  The Clerk of Court is directed to UNSEAL ECF No. 149 and its respective exhibits and ECF No. 150 and its respective exhibits.**

IT IS FURTHER ORDERED that **the Clerk of Court is directed to file the summary-judgment motion [ECF No. 149-1] and the motion to exclude [ECF No. 150-1] along with their respective exhibits [ECF No. 149-2 through ECF No. 149-12 and ECF No. 150-2 through 150-13] so that they are each directly on the docket.**

IT IS FURTHER ORDERED **that this case is REFERRED to the magistrate judge for a MANDATORY SETTLEMENT CONFERENCE.**  The parties' obligation to file their joint pretrial order is STAYED until 10 days after that settlement conference.

_____
U.S. District Judge Jennifer A. Dorsey
March 19, 2024